**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WILMA POWELL,** individually and on behalf of all others similarly situated, | No. |
| Plaintiff, | **COMPLAINT - CLASS ACTION** |
| vs. | **JURY TRIAL DEMANDED** |
| **ADAPTHEALTH CORP.,** | |
| Defendant. | |

Plaintiff Wilma Powell ("Plaintiff") bring this Class Action Complaint on behalf of herself individually, and on behalf of all others similarly situated against Defendant AdaptHealth Corp. ("AdaptHealth" or "Defendant") and alleges, upon personal knowledge as to her own actions and her counsels' investigations, and upon information and belief as to all other matters, as follows:

**NATURE OF ACTION**

1.    On or about July 2, 2026, AdaptHealth disclosed that a threat actor gained unauthorized access to its systems and exfiltrated patient information in a

1

cybersecurity incident ("Data Breach"). AdaptHealth confirmed that the threat actor accessed cloud-based business applications, including internal patient management systems and document storage platforms, and external electronic health record ("EHR") portals.[1]

2. AdaptHealth has admitted that the threat actor obtained and removed data from its systems, including a stored password file associated with insurance billing, passwords associated with insurance billing, and the personally identifiable information ("PII") and protected health information ("PHI") of patients. Although AdaptHealth has not yet disclosed the specific categories of patient information involved, based on the nature of the patient-management systems, document-storage platforms, and EHR portals accessed, Plaintiff alleges on information and belief that the PII and PHI includes patients' names, dates of birth, home addresses, telephone numbers, email addresses, patient-identification and medical-record numbers, health-insurance information and member or policy numbers, healthcare providers, diagnoses and medical conditions, prescription and treatment information, medical equipment and supplies prescribed or provided, dates of service, and claims and billing information (collectively, "Confidential Information").

3. AdaptHealth is a national healthcare company that services

---

[1] AdaptHealth Corp., Current Report (Form 8-K), Item 1.05 (filed July 2, 2026), https://www.sec.gov/Archives/edgar/data/1725255/000110465926080297/ahco-20260627x8k.htm (last visited July 17, 2026).

2

approximately 4.3 million patients annually in all 50 states through its network of approximately 640 locations in 48 states. It provides sleep-therapy, respiratory, diabetes, mobility, and other healthcare-at-home equipment and services, and necessarily collects patient, treatment, insurance, claims, and billing information to provide those services.

4.     AdaptHealth has not yet identified the full scope of the affected data sets or the volume of data involved. It nevertheless determined by June 27, 2026, that the incident was material because of "the nature and potential volume of the data that is at risk." AdaptHealth has also acknowledged the potential publication or misuse of the affected data and the possible effects on patients.

5.     AdaptHealth admitted that the Data Breach resulted from a successful social-engineering attack that compromised a user session associated with a third-party contractor. The compromised session provided a pathway into systems containing patient data, billing credentials, and EHR access.

6.     On June 15, 2026, the threat actor contacted AdaptHealth and claimed to have obtained data from its systems. By that point, the threat actor had already gained access to AdaptHealth's cloud applications, accessed external EHR portals, and exfiltrated data.

7.     Despite learning of the Data Beach on June 15, 2026, AdaptHealth has not yet provided notice to the United States Department of Health and Human Services or provided direct notice to individual patients impacted by the Data

3

Breach. Adapt Health has also failed to disclose important details of the Data Breach, including the precise method of social engineering, the date unauthorized access began, the length of time the contractor session remained compromised, and the volume and specific categories of Confidential Information accessed and exfiltrated by the threat actors.

8.     While millions of patients sought out and/or used Defendant's services to obtain health care services, unauthorized parties stole and used their highly sensitive Confidential Information without the victims' knowledge.  Defendant's lax security practices allowed this intrusion to occur and their failure to promptly notify Plaintiff and Class Members about the Data Breach have worsened Plaintiff's and other Class Members' lives by, among other injuries: (a) adding to their already heightened financial obligations by placing them at an increased risk of fraud; (b) complicating diagnosis, prognosis, and treatment for their medical conditions by placing them at an  increased risk of having inaccurate medical information in their files; and/or (c) increasing the risk of other potential personal, professional, or financial harms that could be caused as a result of having their Confidential Information exposed.

9.     To make matters worse, the Data Breach was foreseeable. Before the Data Breach, AdaptHealth specifically warned investors that unauthorized parties could deceive its employees or contractors through social engineering to gain access to its systems. AdaptHealth also recognized that its business depended on third-party

systems, that contractors could expose patient data, and that security incidents could remain undetected for extended periods.

10. AdaptHealth simultaneously represented that it used physical, technical, and administrative safeguards; leveraged NIST guidance; deployed "market leading defense tools"; proactively monitored vulnerabilities and threats; and maintained a vendor-management and risk-assessment program intended to ensure that third-party environments met HIPAA security requirements. AdaptHealth further claimed that it conducted risk-based due diligence concerning third-party vendors' information-technology controls.

11. AdaptHealth told patients, including recently it its Privacy Notice updated one month before it learned of the Data Breach, that their privacy was of its "utmost concern," that it took "great care" with personal information, and that it was legally required to maintain the privacy of PHI and follow the terms of its Notice.[2]

12. AdaptHealth not only led their patients to believe that they would protect their Confidential Information involved in the Data Breach, but Defendant failed to live up to its own promises as well as its duties and obligations required by law and industry standards.

13. Contrary to its promises to help patients improve the quality of their

---

[2] AdaptHealth Privacy Notice (effective Sept. 23, 2013; last updated May 15, 2026), https://adapthealth.com/pages/myapp-privacy-policy (last visited July 17, 2026).

lives, AdaptHealth's conduct has instead been a direct cause of the ongoing harm to Plaintiff and other Class Members whose suffering has been magnified by the Data Breach, and who will continue to experience harm and data insecurity for the indefinite future.

14. Specifically, Defendant failed to maintain reasonable and/or adequate security measures to protect Plaintiff's and other Class Members' Confidential Information from unauthorized access and disclosure, apparently lacking, at a minimum: (1) reasonable and adequate security measures designed to prevent this attack even though Defendant knew or should have known that it was a prized target for hackers; and (2) reasonable and adequate security protocols to promptly detect the unauthorized intrusion into and removal of Confidential Information from its network pertaining to thousands of patients.

15. Armed with Confidential Information, hackers can sell the Confidential Information to other unauthorized users or misuse themselves to commit a variety of crimes that harm Plaintiff and Class Members. For instance, they can take out loans, mortgage property, open financial accounts, and open credit cards in a victim's name; use a victim's information to obtain government benefits or file fraudulent returns to obtain a tax refund; obtain a driver's license or identification card in a victim's name; gain employment in another person's name; give false information to police during an arrest; or engage in medical fraud that can result in financial harm or a harmful misdiagnosis to Plaintiff and Class Members..

6

16. As a result of Defendant's willful failure to prevent the Data Breach, Plaintiff and Class Members are more susceptible to identity theft, fraud, and other harm, and have experienced, will continue to experience, and face an increased risk of financial harms.

17. As of the filing of this Complaint, AdaptHealth has not publicly disclosed the number of patients affected, the date the unauthorized access began, the duration of the unauthorized access, the particular PII and PHI taken for each patient, or whether the exfiltrated information has been disseminated. Plaintiff has not received individualized notice identifying whether her Confidential Information was taken or the specific information placed at risk.

18. Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Plaintiff's and Class Members' Confidential Information that Defendant collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

19. Plaintiff seeks remedies including, but not limited to, compensatory damages for identity theft, fraud, and time spent, reimbursement of out-of-pocket costs, adequate credit and medical monitoring services funded by Defendant, and injunctive relief including improvements to Defendant's data security systems and practices to ensure they have reasonably sufficient security practices to safeguard

patients' Confidential Information that remains in Defendant's custody to prevent incidents like the Data Breach from reoccurring in the future.

20. As a direct and proximate result of Defendant's wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiff's and Class Members' Confidential Information, Plaintiff have incurred (and will continue to incur) economic damages, and other actual injury and harm, in the form of (i) actual identity theft or identity fraud; (ii) the untimely and/or inadequate notification of the Data Breach; (iii) unauthorized disclosure of their Confidential Information; (iv) breach of the statutorily-protected confidentiality of their Confidential Information; (v) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud caused by the Data Breach; (vi) the value of their time spent mitigating the impact of the Data Breach and mitigating increased risk of identity theft and/or identity fraud; (vii) deprivation of the value of their Confidential Information, for which there is a well-established national and international market; (viii) interference with their right to control their personal information; and (ix) the impending, imminent, and ongoing increased risk of future identity theft, identity fraud, economic damages, and other actual injury and harm.

## PARTIES

21. Plaintiff Wilma Powell is a natural person and a citizen of Granite City, Illinois, where she intends to remain. Plaintiff is an AdaptHealth patient, and

8

AdaptHealth provides her with home medical equipment, including a walker. In connection with those services, Plaintiff directly or indirectly entrusted AdaptHealth with her Confidential Information. Plaintiff reasonably believed AdaptHealth would maintain the privacy and security of that information, comply with its Privacy Notice, and use reasonable measures to prevent unauthorized access and disclosure. Plaintiff believes she paid a premium to AdaptHealth for its data security, and she would not have used AdaptHealth's services or provided her Confidential Information to AdaptHealth had she known that they would disclose, or allow to be disclosed, her Confidential Information, making it available to unauthorized parties. Plaintiff would not have entrusted AdaptHealth with her Confidential Information on the same terms had she known AdaptHealth would fail to protect it from a foreseeable social-engineering attack and unauthorized exfiltration. Plaintiff has spent time monitoring for misuse and will continue to spend time protecting herself from the increased risks created by the Data Breach. Plaintiff has a continuing interest in ensuring that the Confidential Information AdaptHealth retains is protected from further unauthorized access.

22. Defendant AdaptHealth Corp. is a Delaware corporation with its principal place of business at 555 East North Lane, Suite 5075, Conshohocken, Pennsylvania 19428. AdaptHealth operates throughout the United States and provides healthcare-at-home products and services to patients in all 50 states.

9

## JURISDICTION AND VENUE

23. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5 million, exclusive of interest and costs; at least one member of the proposed Class is a citizen of a state different from Defendant; and the proposed Class includes more than 100 members.

24. This Court has personal jurisdiction over AdaptHealth because AdaptHealth is headquartered in Pennsylvania, regularly conducts business in Pennsylvania, and has sufficient minimum contacts with Pennsylvania.

25. Venue is proper in this District under 28 U.S.C. § 1391 because AdaptHealth's principal office is located in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in or emanated from this District.

## BACKGROUND

*Defendant Collected and Stored the Confidential Information of Plaintiff and the Class*

26. AdaptHealth describes itself as a national leader in patient-centered, healthcare-at-home solutions, including home medical equipment, medical supplies, and related services.

27. AdaptHealth operates four business segments: Sleep Health, Respiratory Health, Diabetes Health, and Wellness at Home.

28. Its Sleep Health segment provides CPAP and BiLevel equipment, supplies, and services to patients with obstructive sleep apnea. Its Respiratory Health segment provides oxygen, ventilation equipment, and chronic-therapy services to patients with respiratory disease. Its Diabetes Health segment provides continuous glucose monitors, insulin pumps, and related services. Its Wellness at Home segment provides medical equipment and services to patients at home, including patients discharged from hospitals and other facilities and patients navigating complex disease states.

29. As of December 31, 2025, AdaptHealth serviced approximately 4.3 million patients annually in all 50 states through approximately 640 locations in 48 states and completed an average of approximately 38,500 equipment and supply deliveries each day.

30. AdaptHealth receives patient referrals from hospitals, sleep laboratories, physicians, skilled-nursing facilities, hospice operators, and primary-care providers. It invoices payors and patients directly for delivered products and services.

31. To perform these functions, AdaptHealth uses integrated systems supporting intake, clinical operations, billing, receivables management, order processing, inventory management, patient management, document storage, and access to external EHR systems.

32. As a result, AdaptHealth collects and stores information that identifies

patients and reflects their medical conditions, prescribed equipment, treatment, healthcare providers, insurance coverage, claims, billing, and payment for healthcare services.

33.   Plaintiff and Class Members relied on AdaptHealth to keep their Confidential Information securely maintained, use it only for authorized healthcare and business purposes, and make only authorized disclosures.

34.   In collecting and maintaining Confidential Information, AdaptHealth agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their AdaptHealth.

35.   Under state and federal law, businesses like AdaptHealth have duties to protect Confidential Information in its possession and to notify breach victims about breaches.

***The Data Breach***

36.   On June 15, 2026, AdaptHealth received a communication from a threat actor claiming to have obtained data from AdaptHealth's systems. AdaptHealth activated its incident-response procedures, began an investigation with external advisors and cybersecurity experts, and notified law enforcement. The investigation confirmed that a threat actor gained unauthorized access to AdaptHealth's cloud-based business applications, including internal patient-management systems and document-storage platforms.

37.    AdaptHealth confirmed that the threat actor accessed external EHR system portals. Those portals exist to provide access to highly sensitive medical information maintained by healthcare providers. AdaptHealth further confirmed that the threat actor exfiltrated data, including a stored password file associated with insurance billing, passwords associated with insurance billing, and patients' PII and PHI.

38.    The Data Breach resulted from a successful social-engineering attack that compromised a user session associated with a third-party contractor. Following the Data Breach, AdaptHealth disabled the compromised account, reset affected credentials, and implemented additional access controls. AdaptHealth claims to have contained the incident, but continues to investigate its nature and scope with external forensic teams.

39.    By June 27, 2026, AdaptHealth determined that the incident was material because of the nature and potential volume of the data at risk.

40.    Although AdaptHealth has stated that the affected systems do not collect Social Security numbers and do not store individual financial-account or payment-card information, it has not disclosed the specific categories of PII or PHI that were exfiltrated beyond acknowledging patient PII, PHI, and insurance-billing credentials were involved. AdaptHealth admits that the full scope of affected data sets has not been determined and that specific information about the volume of data is not available.

41. Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative Class can be ascertained from information in Defendant's custody and control.

42. Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII and PHI. Defendant caused widespread injury and monetary damages.

43. Defendant has done little to remedy its Data Breach. Because of Defendant's Data Breach, the sensitive information of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

### *The U.S. Department of Health and Human Services*

44. Plaintiff's and Class Members' Confidential Information is "protected health information" as defined by 45 CFR § 160.103.

45. Pursuant to 45 CFR § 164.408(a), Breach Reports are filed with the Secretary of the U.S. Department of Health and Human Services "following the discovery of a breach of unsecured protected health information."

46. 45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

14

47. 45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

48. Plaintiff's and Class Members' Confidential Information is "unsecured protected health information" as defined by 45 CFR § 164.402.

49. As a result of the Data Breach, Plaintiff's and Class Members' unsecured protected health information has been acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E.

50. Based on information and belief, Defendant themselves believe that as a result of the Data Breach, Plaintiff's and Class Members' unsecured protected health information has been acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart.

51. As a result of the Data Breach, Plaintiff's and Class Members' unsecured protected health information was acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E and was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

52. Based on information and belief, Defendant itself reasonably believe Plaintiff's and Class Members' unsecured protected health information was acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E and was not rendered unusable, unreadable, or indecipherable to

15

unauthorized persons.

53.    As a result of the Data Breach, Plaintiff's and Class Members' unsecured protected health information was acquired, accessed, used, viewed and/or disclosed in a manner not permitted under 45 CFR Subpart E, and was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

54.    As a result of the Data Breach, Plaintiff's and Class Members' unsecured protected health information was viewed by unauthorized persons in a manner not permitted under 45 CFR Subpart E.

55.    Based on information and belief, Defendant themselves as a result of the Data Breach reasonably believe Plaintiff's and Class Members' unsecured protected health information was viewed by unauthorized persons in a manner not permitted under 45 CFR Subpart E.

56.    It is reasonable to infer that as a result of the Data Breach Plaintiff's and Class Members' unsecured protected health information that was acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E, and was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

57.    It should be rebuttably presumed that unsecured protected health information acquired, accessed, used, viewed and/or disclosed in a manner not permitted under 45 CFR Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized

persons.

58. After receiving notice that they were victims of a data breach that required the filing of a Breach Report in accordance with 45 CFR § 164.408(a), it is reasonable for recipients of that notice, including Plaintiff and Class Members in this case, to believe that future harm (including identity theft) is real and imminent, and to take steps to mitigate that risk of future harm.

***AdaptHealth Acquired, Collected, and Stored Plaintiff's and Class Members' Confidential Information***

59. AdaptHealth acquired, collected, stored, used, and transmitted Plaintiff's and Class Members' Confidential Information.

60. As a condition of receiving healthcare-at-home products and services, Plaintiff and Class Members were required to entrust AdaptHealth, directly or through their healthcare providers and insurers, with highly sensitive PII and PHI.

61. By collecting and storing that information, AdaptHealth assumed legal and equitable duties and knew or should have known that it was responsible for protecting the information from unauthorized access and disclosure.

62. Plaintiff and Class Members took reasonable steps to maintain the confidentiality of their Confidential Information and relied on AdaptHealth to keep it secure, use it only for authorized purposes, and make only authorized disclosures.

63. AdaptHealth acknowledged in its public filings that cyberattacks involving patient PHI could cause the loss of confidential data, expose it to liability

under HIPAA and consumer-protection law, subject it to litigation and government enforcement, and damage its reputation.

64.   AdaptHealth also acknowledged that it outsourced business functions to third-party providers and contractors and that those providers might fail to protect AdaptHealth's and its patients' confidential data.

65.   In its Privacy Notice, AdaptHealth represented that it was required by law to maintain the privacy of PHI, provide notice of its legal duties and privacy practices, and follow the terms of the Notice.

66.   The Privacy Notice further represented that AdaptHealth would use and disclose health information only for identified purposes or with written permission and that its business associates were obligated to protect patient information.

67.   Plaintiff and Class Members reasonably relied on AdaptHealth's relationship of trust and its representations concerning the confidentiality and security of their health information.

***The Healthcare Sector is Particularly Susceptible to Cyberattacks.***

68.   AdaptHealth was on notice that healthcare organizations and the vendors and contractors that support them are frequent targets of cyberattacks because they maintain large volumes of valuable PII and PHI.

69.   AdaptHealth was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare

industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."

70. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.

71. When compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage. Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.

19

72. According to analysis performed by U.S. Department of Health and Human Services ("HHS"), 45 million people in 2021 were affected by healthcare cyberattacks, triple the 14 million affected in 2018. In 2022, HHS posted an alert warning healthcare organizations of an "exceptionally aggressive" ransomware group that is known to target the healthcare center, and noted that healthcare organizations should try to protect themselves with continuous monitoring and an active vulnerability management program. The alert also suggested keeping backups of data in multiple locations and using two-factor authentication with strong passwords.

73. According to a TENABLE study conducted over a 14-month period, a "root cause was reported in 93.17% of the healthcare breaches disclosed in the 14-month period [it] analyzed. Among these, ransomware was by far the most prominent root cause of healthcare breaches, accounting for a whopping 54.95%. Other leading causes included email compromise/phishing (21.16%), insider threat (7.17%) and unsecured databases (3.75%)."

74. In a survey released by Ponemon Institute in January 2023, nearly half of respondents (47%) said their organizations experienced a ransomware attack in the past two years, up from 43% in 2021. 45% of those respondents reported complications from medical procedures due to ransomware attacks, up from 36% in 2021.

75. In light of several recent high profile cybersecurity incidents affecting

the healthcare industry, including the American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), AdaptHealth knew or should have known that their electronic records would be targeted by cybercriminals.

76.    Given the nature of the Data Breach, it is foreseeable that the compromised Confidential Information will be used to access Plaintiff's and the Class members' other accounts, thereby providing access to additional Confidential Information or personal and sensitive information. Therefore, the compromised Confidential Information in the Data Breach is of great value to hackers and unauthorized users and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and unauthorized users. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."  For example, different Private Information elements from various sources may be linked in order

21

to identify an individual, or access additional information about or relating to that individual.

77. Further, as technology advances, computer programs may scan the Internet with an ever-widening scope to create a mosaic of information that may be used to link information to an individual in ways not previously possible. This is known as the "mosaic effect."

78. Names and dates of birth, combined with contact information like telephone numbers and addresses, are very valuable to hackers and identity thieves as these items allow them to access users' other accounts, particularly when those users have easily decrypted passwords or security questions.

79. The Confidential Information that Defendant exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a variety of unlawful manners, including opening new credit and financial accounts in victims' names, obtaining protected health information, and/or committing medical fraud.

80. Unfortunately, for Plaintiff and Class members, a person whose Private Information has been compromised may not fully experience the effects of the breach for years to come:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm

22

resulting from data breaches cannot necessarily rule out all future harm.

81.    Accordingly, as a healthcare entity in possession of its Plaintiff's and Class Members' Confidential Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached.

82.    Healthcare cyberattacks threaten not only financial privacy, but also the confidentiality and integrity of medical records and patients' ability to obtain appropriate care.

83.    HHS has specifically warned the healthcare and public-health sector that social engineering is used to obtain sensitive information, gain unauthorized access, and disrupt operations, and that targets include employees, customers, and vendors.

84.    HHS has further warned that phishing remains one of the most effective social-engineering techniques used against healthcare organizations and that technical and non-technical mitigations are both necessary.

85.    These warnings were directly relevant to AdaptHealth, which relied on third-party contractors and gave them access to cloud applications and systems containing PHI.

86.    AdaptHealth itself identified this exact threat in its 2025 Form 10-K,

23

warning that  "[u]nauthorized parties may attempt to gain access to AdaptHealth's systems or facilities, or those of third parties with whom AdaptHealth does business, including its confidential managed file transfer software providers, through fraud or other forms of deceiving its employees or contractors (e.g., social engineering)."

87.    AdaptHealth also acknowledged that the use of mobile and connected devices increased the risk of unauthorized access to confidential information and that incidents affecting AdaptHealth or its vendors could remain undetected for an extended period.

88.    Accordingly, the social-engineering attack, compromise of a contractor session, and resulting access to cloud applications and EHR portals were not novel or unforeseeable risks. AdaptHealth identified those risks before the Data Breach and had a duty to implement controls reasonably designed to address them.

***Securing PII and PHI and Preventing Breaches***

89.    AdaptHealth could have prevented or materially limited the Data Breach by implementing reasonable, well-known safeguards for social engineering, contractor access, authenticated sessions, cloud applications, credentials, and PHI.

90.    Defendant's negligence in safeguarding the Confidential Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

91.    Despite the prevalence of public announcements of data breach and data security compromises, especially in the healthcare context, Defendant failed to take

appropriate steps to protect the Confidential Information of Plaintiff and Class Members from being compromised.

92. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

93. The ramifications of Defendant's failure to keep secure the PII and PHI of Plaintiff and Class Members are long lasting and severe. Once PII and PHI is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims is an imminent and impending threat of injury that continues for years.

94. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[3]

---

[3] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed Jan. 10, 2025).

95.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

a. Implement an awareness and training program.  Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

b. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

c. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d. Configure firewalls to block access to known malicious IP addresses.

e. Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

f. Set anti-virus and anti-malware programs to conduct regular scans automatically.

g. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless

26

absolutely needed; and those with a need for administrator accounts should only use them when necessary.

h.  Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i.  Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

j.  Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

k.  Consider disabling Remote Desktop protocol (RDP) if it is not being used.

l.  Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

m. Execute operating system environments or specific programs in a virtualized environment.

n.  Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

96.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

a. Update and patch your computer.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

b. Use caution with links and when entering website addresses.  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

c. Open email attachments with caution. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

d. Keep your personal information safe.  Check a website's security to

ensure the information you submit is encrypted before you provide it….

e.  Verify email senders.  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

f.  Inform yourself.  Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

g.  Use and maintain preventative software programs. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[4]

97.  To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence

---

[4] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), available at https://www.cisa.gov/news-events/news/protecting-against-ransomware (last visited Jan. 10, 2025).

Team, the following measures:

- **Secure internet-facing assets**
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audit; remove privileged credentials
- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise;
- **Include IT Pros in security discussions**
  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;
- **Build credential hygiene**
  - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords
- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events
- **Harden infrastructure**
  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[5]

98. Given that Defendant were storing the Confidential Information of thousands of individuals, Defendant could and should have implemented all of the above measures to prevent and detect ransomware attacks.

99. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the Confidential Information of thousands of individuals, including Plaintiff and Class Members.

***The Value of Confidential Information and the Effects of Unauthorized Disclosure.***

100. At all relevant times, Defendant was well aware that the Confidential Information it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

101. Confidential Information is a valuable commodity to identity thieves. Identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud. Indeed, a robust cyber black market exists in which criminals openly post stolen PII and PHI on multiple underground

---

[5] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Jan. 10, 2025).

Internet websites, commonly referred to as the dark web.

102.  While credit card information and associated PII can sell for as little as $1-$2 on the black market, PHI can sell for as much as $363 according to the Infosec Institute.

103.  PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

104.  Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."

105.  Similarly, the FBI Cyber Division, in an April 8, 2014 Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can

then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.

106. The ramifications of Defendant's failure to keep its patients' Confidential Information secure are long lasting and severe. Once Confidential Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

107. Further, criminals often trade stolen Confidential Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Confidential Information on the internet, thereby making such information publicly available.

108. Approximately 28% of victims do not realize their identify has been compromised until more than a year after it has happened. This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.

109. Breaches are particularly serious in healthcare industries. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach. Indeed,

when compromised, healthcare related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.

110. As a healthcare provider, Defendant knew, or should have known, the importance of safeguarding its patients' Confidential Information entrusted to it and of the consequences if its data security systems were breached. This includes the significant costs that would be imposed on Defendant's patients as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

111. The compromised Confidential Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII." For example, different PII elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual. Based upon information and belief, the unauthorized parties utilized

the Confidential Information they obtained through the Data Breach to obtain additional information of Plaintiff and Class Members that were misused.

112. Further, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

113. Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Confidential Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiff.

114. Additionally, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage. Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. 40 percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have

35

a crippling effect on individuals, and detrimentally impact the economy as a whole.

115.  The Confidential Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breaches can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names and perpetrating medical and insurance fraud.

*Defendant's Conduct Violates HIPAA.*

116.  HIPAA requires covered entities to protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

117.  Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, et seq. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Confidential Information like the data Defendant left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

118.  The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

119.  Based on information and belief, the Data Breach resulted from a

36

combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations. Defendant's security failures include, but are not limited to, the following:

    a.    Failing to ensure the confidentiality and integrity of electronic protected health information that Defendant create, receive, maintain, store and transmit in violation of 45 C.F.R. §164.306(a)(1);

    b.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

    c.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

    d.    Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

    e.    Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

    f.    Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the

privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

g.    Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(94);

h.    Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, et seq.;

i.    Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

j.    Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

***Defendant Failed to Comply with FTC Guidelines.***

120.  Defendant was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for

consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. See, e.g., FTC v. Wyndham Worldwide Corp., 799 F.3d 236 (3d Cir. 2015).

121. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

122. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

123. The FTC further recommends that companies not maintain Confidential Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

124. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to

confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

125. Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Confidential Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

126. Defendant was at all times fully aware of its obligation to protect the Confidential Information of patients because of its position as a trusted healthcare provider. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***Defendant Failed to Comply with Healthcare Industry Standards.***

127. HHS's Office for Civil Rights notes:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations, as they store large quantities of highly Private and valuable data.

128. HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience that require a relatively small financial investment, yet can have a major impact on an organization's cybersecurity posture

40

including: (a) the proper encryption of Confidential Information; (b) educating and training healthcare employees on how to protect Confidential Information; and (c) correcting the configuration of software and network devices.

129. Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Defendant chose to ignore them. These best practices were known, or should have been known by Defendant, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Confidential Information.

*Plaintiff and Class Members Suffered Damages*

130. The ramifications of Defendant's failure to keep patients' Confidential Information secure are long-lasting and severe. Once Confidential Information is stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.

131. In addition to their obligations under state laws and regulations, Defendant owed a common law duty to Plaintiff and Class Members to protect Confidential Information entrusted to it, which included exercising reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Confidential Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

132. Defendant further owed and breached its duty to Plaintiff and Class

41

Members to implement processes and specifications that would detect a breach of its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

133. As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse to Plaintiff's and Class Members Confidential Information as detailed above, and Plaintiff is now at a heightened and increased risk of identity theft and fraud.

134. The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

135. Other risks of identity theft include loans opened in the name of the victim, medical services billed in their name, utility bills opened in their name, tax return fraud, and credit card fraud.

136. Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received healthcare and other services that were of a diminished value to that described in their agreements with Defendant and they were damaged in an amount at least equal to the difference in the value of the healthcare with data

42

security protection they paid for and the healthcare they received.

137. As a result of the Data Breach, Plaintiff's and Class Members' Confidential Information has diminished in value.

138. The Confidential Information belonging to Plaintiff and Class Members is private, private in nature, and was left inadequately protected by Defendant who did not obtain Plaintiff's or Class Members' consent to disclose such Confidential Information to any other person as required by applicable law and industry standards.

139. Plaintiff's and Class Members' Confidential Information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed Confidential Information for targeted marketing, particularly scam marketing which several Plaintiff has experienced, without the approval of Plaintiff and Class Members. Due to the Data Breach, unauthorized individuals can easily access the Confidential Information of Plaintiff and Class Members.

140. The Data Breach was a direct and proximate result of Defendant's failure to (a) properly safeguard and protect Plaintiff's and Class Members' Confidential Information from unauthorized access, use, viewing, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' Confidential Information; and (c) protect against reasonably foreseeable

43

threats to the security or integrity of such information.

141. Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect patient data.

142. Had Defendant remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into its systems and, ultimately, the theft of Plaintiff's and Class Members' Confidential Information.

143. As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

144. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."

145. Defendant's failure to adequately protect Plaintiff's and Class Members' Confidential Information has resulted in Plaintiff and Class Members having to undertake numerous tasks to protect their information, which require

extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money – while Defendant sit by and do nothing to assist those affected by the incident. Instead, as Defendant's Data Breach notice indicates, it is putting the burden on Plaintiff and Class Members to discover possible fraudulent activity and identity theft.

146.   Plaintiff and Class Members have been damaged in several other ways as well. Plaintiff and Class Members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Confidential Information. Plaintiff and Class Members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming activity. Class Members may have also purchased credit monitoring and other identity protection services, purchased credit reports, placed credit freezes and fraud alerts on their credit reports, and spent time investigating and disputing fraudulent or suspicious activity on their accounts. Plaintiff and Class Members also suffered a loss of the inherent value of their Confidential Information.

147.   The Confidential Information stolen in the Data Breach can be misused on its own, or can be combined with personal information from other sources such as publicly available information, social media, etc. to create a package of information capable of being used to commit further identity theft. Thieves can also use the stolen Confidential Information to send spear-phishing emails to Class

Members to trick them into revealing sensitive information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the individual agrees to provide sensitive information requested in the email, such as login credentials, account numbers, and the like.

148. As a result of Defendant's failures to prevent the Data Breach, Plaintiff and Class Members have suffered, will suffer, and are at increased risk of suffering:

a. The compromise, publication, theft and/or unauthorized use of their Confidential Information;

b. Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

c. Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

d. The continued risk to their Confidential Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fail to undertake appropriate measures to protect the Confidential Information in their possession;

e. Current and future costs in terms of time, effort and money that will be

expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and

f. Anxiety and distress resulting from fear of misuse of their Confidential Information.

149. In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Confidential Information is secure, remains secure, and is not subject to further misappropriation and theft.

***Defendant's Delay in Identifying & Reporting the Breach Caused Additional Harm***

150. It is axiomatic that:

> The quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act.

151. Indeed, once a data breach has occurred:

> [o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills, insurance invoices, and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers. If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves (internal citations omitted).

152.   Although their Confidential Information was improperly exposed as late as June 2026, many Class Members have still not been notified of the Data Breach, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

153.   As a result of Defendant's delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiff and Class Members has been driven even higher.

## CLASS ACTION ALLEGATIONS

154.   Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals whose Confidential Information was compromised in the Data Breach.

155.   Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

156.   Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

157.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of Plaintiff's claims on class-wide basis

48

using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

158. Ascertainability: All members of the proposed Class are readily ascertainable from information in Defendant's custody and control.

159. Numerosity, Fed R. Civ. P. 23(a)(1): The Nationwide Class and state Subclass (the "Classes") are so numerous that joinder of all members is impracticable. Defendant reported to the U.S. Department of Health and Human Services Office for Civil Rights that 6,890 individuals were impacted by the Data Breach. Defendant's records and expert discovery will demonstrate when this number is accurate and will identify members of the Classes.

160. Typicality: Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

161. Adequacy: Plaintiff will fairly and adequately protect the proposed Class's common interests. Plaintiff's interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

162. Commonality and Predominance: Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding

can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions.

a.    if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's Confidential Information;

b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    if Defendant was negligent in maintaining, protecting, and securing Confidential Information;

d.    if Defendant breached contract promises to safeguard Plaintiff and the Class's Confidential Information;

e.    if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f.    if the Data Breach caused Plaintiff and the Class injuries;

g.    what the proper damages measure is; and

h.    if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

163.    Superiority: A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual

litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

164. Unless a Class-wide injunction is issued, Plaintiffs and Class Members remain at risk that Defendant will continue to fail to properly secure the Confidential Information of Plaintiffs and Class Members resulting in another data breach, continue to refuse to provide proper notification to Class Members regarding the Data Breach, and continue to act unlawfully as set forth in this Complaint.

165. Defendant have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

166. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

51

167. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Confidential Information;

168. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Confidential Information;

169. Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

170. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

171. Whether Class Members are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

## FIRST CAUSE OF ACTION

### Negligence

### (On Behalf of Plaintiff and the Class)

172. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

173. Plaintiff and the Class entrusted their Confidential Information to Defendant on the premise and with the understanding that Defendant would

52

safeguard their Confidential Information, use their Confidential Information for business purposes only, and/or not disclose their Confidential Information to unauthorized third parties.

174. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their Confidential Information in a data breach. And here, that foreseeable danger came to pass.

175. Defendant has full knowledge of the sensitivity of the Confidential Information and the types of harm that Plaintiff and the Class could and would suffer if their Confidential Information was wrongfully disclosed.

176. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class Members' Confidential Information.

177. Defendant owed—to Plaintiff and Class Members—at least the following duties to:

    a.    exercise reasonable care in handling and using the Confidential Information in its care and custody;

    b.    implement industry-standard security procedures sufficient to

reasonably protect the information from a data breach, theft, and unauthorized;

c.    promptly detect attempts at unauthorized access;

d.    notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their Confidential Information.

178. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their Confidential Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

179. Defendant also had a duty to exercise appropriate clearinghouse practices to remove Confidential Information it was no longer required to retain under applicable regulations.

180. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Confidential Information of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

181. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class.

That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Defendant with their Confidential Information, a necessary part of obtaining services from Defendant.

182. The risk that unauthorized persons would attempt to gain access to the Confidential Information and misuse it was foreseeable. Given that Defendant hold vast amounts of Confidential Information, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the Confidential Information — whether by malware or otherwise.

183. Confidential Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Confidential Information of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

184. Defendant improperly and inadequately safeguarded the Confidential Information of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

185. Defendant breached these duties as evidenced by the Data Breach.

186. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' Confidential Information by:

    a.    disclosing and providing access to this information to third parties and

    b.    failing to properly supervise both the way the Confidential

Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

187. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Confidential Information of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

188. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

189. Defendant has admitted that Confidential Information of the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

190. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

191. And, on information and belief, Plaintiff's Confidential Information has already been published—or will be published imminently—by cybercriminals on the dark web.

56

192. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Confidential Information by criminals, improper disclosure of their Confidential Information, lost benefit of their bargain, lost value of their Confidential Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION

### Negligence Per Se

### (On Behalf of Plaintiff and the Class)

193. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

194. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Confidential Information.

195. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the Confidential Information entrusted to it. The FTC publications and orders

promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive Confidential Information.

196.   Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Confidential Information.

197.   Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Confidential Information and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Confidential Information Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

198.   The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

199.   But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

200.   The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew

or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their Confidential Information.

201.  Defendant's various violations and its failure to comply with applicable laws and regulations constitutes negligence per se.

202.  As a direct and proximate result of Defendant's negligence per se, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## THIRD CAUSE OF ACTION

### Breach of Implied Contract

### (On Behalf of Plaintiff and the Class)

203.  Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

204.  Plaintiff and Class Members were required to provide their Confidential Information to Defendant as a condition of receiving services provided by Defendant. Plaintiff and Class Members provided their Confidential Information to Defendant or its third-party agents in exchange for Defendant's services.

205.  Plaintiff and Class Members reasonably understood that a portion of the funds derived from their labor would be used to pay for adequate cybersecurity measures.

206.  Plaintiff and Class Members reasonably understood that Defendant

would use adequate cybersecurity measures to protect the Confidential Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

207. Plaintiff and the Class Members accepted Defendant's offers by disclosing their Confidential Information to Defendant or its third-party agents in exchange for services.

208. In turn, and through internal policies, Defendant agreed to protect and not disclose the Confidential Information to unauthorized persons.

209. In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiff's and Class Member's Confidential Information.

210. Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Confidential Information.

211. After all, Plaintiff and Class Members would not have entrusted their Confidential Information to Defendant in the absence of such an agreement with Defendant.

212. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

213. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and

discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

214.  Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

215.  Defendant materially breached the contracts it entered with Plaintiff and Class Members by:

a.      failing to safeguard their information;

b.      failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c.      failing to comply with industry standards;

d.      failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.      failing to ensure the confidentiality and integrity of the electronic Confidential Information that Defendant created, received, maintained, and transmitted.

216.  In these and other ways, Defendant violated its duty of good faith and fair dealing.

217.  Defendant's material breaches were the direct and proximate cause of

61

Plaintiff's and Class Members' injuries (as detailed *supra*).

218. And, on information and belief, Plaintiff's Confidential Information has already been published—or will be published imminently—by cybercriminals on the dark web.

219. Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment

### (On Behalf of Plaintiff and the Class)

220. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

221. This claim is pleaded in the alternative to currently pleaded or future contract claims.

222. Plaintiff and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from using their Confidential Information to facilitate services.

223. Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

224. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Confidential Information that they were required to provide based on Defendant's duties under state and

federal law and its internal policies.

225.  Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Confidential Information.

226.  Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and Class Members' Confidential Information because Defendant failed to adequately protect their Confidential Information.

227.  Plaintiff and Class Members have no adequate remedy at law.

228.  Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

<u>**FIFTH CAUSE OF ACTION**</u>

**Declaratory Judgment**

**(On Behalf of Plaintiff and the Class)**

229.  Plaintiff incorporates by reference all other paragraphs as if fully set

forth herein.

230. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

231. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

232. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.    Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

    b.    Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

    c.    Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

    d.    Defendant's breach of its duties caused—and continues to cause—injuries to Plaintiff and Class Members.

233. The Court should also issue corresponding injunctive relief requiring

Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

234. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

235. And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages— while warranted for out-of-pocket damages and other legally quantifiable and provable damages— cannot cover the full extent of Plaintiff and Class Members' injuries.

236. If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

237. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all members of the Classes, request judgment against the Defendant and that the Court grant the following relief:

A. An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Classes requested herein, appointing the undersigned as Class Counsel, and finding that Plaintiffs are proper representatives of the Classes requested herein;

B. Injunctive relief requiring Defendant to (1) strengthen their data security systems that maintain personally identifying information to comply with the applicable state laws alleged herein and best practices under industry standards; (2) engage third-party auditors and internal personnel to conduct security testing and audits on Defendant's systems on a periodic basis; (3) promptly correct any problems or issues detected by such audits and testing; and (4) routinely and continually conduct training to inform internal security personnel how to prevent, identify and contain a breach, and how to appropriately respond;

C. An order requiring Defendant to pay all costs associated with class notice and administration of class-wide relief;

D. An award to Plaintiffs and all members of the Classes of compensatory, consequential, incidental, nominal, and statutory damages, restitution, and disgorgement, in an amount to be determined at trial;

E. That the Court award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law.

F. An award of credit and medical monitoring and identity theft protection

services to Plaintiffs and all members of the Classes;

G.    An award of attorneys' fees, costs, and expenses, as provided by law or

equity;

H.    An award for equitable relief requiring restitution and disgorgement of

the revenues wrongfully retained as a result of Defendant's wrongful

conduct;

I.    An order requiring Defendant to pay pre-judgment and post-judgment

interest, as provided by law or equity; and

J.    Any such other and further relief as this Court may deem just and proper.

Date: July 17, 2026                    Respectfully submitted,

*/s/ Daniel S. Robinson*
Daniel S. Robinson (PA I.D. No. 310921)
ROBINSON CALCAGNIE, INC.
19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288; Fax: (949) 720-1292
drobinson@robinsonfirm.com

*Attorneys for Plaintiff and Proposed Class*

67

# DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Date: July 17, 2026                    Respectfully submitted,

*/s/ Daniel S. Robinson*

Daniel S. Robinson (PA I.D. No. 310921)
ROBINSON CALCAGNIE, INC.
19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288; Fax: (949) 720-1292
drobinson@robinsonfirm.com

*Attorneys for Plaintiff and Proposed Class*